**SO ORDERED.**

**SIGNED this 07 day of November, 2006.**

THIS ORDER HAS BEEN ENTERED ON THE DOCKET.
PLEASE SEE DOCKET FOR ENTRY DATE.

_____
John C. Cook
**UNITED STATES BANKRUPTCY JUDGE**

_____

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **In re:** | ) | |
| | ) | |
| **Target Graphics, Inc.** | ) | **No. 05-14009** |
| | ) | **Chapter 11** |
| **Debtor** | ) | |

**M E M O R A N D U M**

This case came before the court for a confirmation hearing on the debtor's amended plan of reorganization under Chapter 11 and for a hearing on a motion for relief from the automatic stay filed by the debtor's major secured creditor, Merrill Lynch Business Financial Services Inc. ("MLBFS"). MLBFS opposed confirmation of the debtor's amended plan on three grounds: (1) that the plan is not feasible; (2) that the plan violates the absolute priority rule; and (3) that the plan undervalues MLBFS's secured claim. Having considered the evidence presented at the confirmation hearing, and having further considered the arguments and briefs of the parties, the

-1-

court concludes that the plan does violate the absolute priority rule and does undervalue the secured claim. Accordingly, confirmation must be denied, rendering moot the "feasibility" issue. The court further concludes that the motion for relief from the stay should be granted.

MLBFS filed proofs of claim in this case totaling $1,936,489, and there is no dispute that it holds a blanket lien on all of the debtor's assets. Because the amount of its total claim exceeds the value of its collateral, MLBFS is undersecured. On March 20, 2006, the debtor filed its initial plan of reorganization wherein it classified the secured portion of MLBFS's claim at $613,532.50 to be paid in quarterly payments of $37,101.99 with interest at 7.75%. The remaining amount of MLBFS's claim was classified as unsecured, and it was to be paid with other unsecured creditors on a pro rata basis at $8,850 per quarter. The debtor's schedules list other unsecured debt in the approximate amount of $400,000.

MLBFS filed an objection to the debtor's initial plan of reorganization asserting the same objections that it now asserts against the debtor's amended plan. Although the debtor solicited ballots for its initial plan, it was not able to obtain the requisite support for a consensual plan because MLBFS cast its ballot against the plan. The debtor then sought, and was granted leave, to file an amended plan.

On June 23, 2006, the debtor filed its amended plan of reorganization. The amended plan proposes the same treatment for MLBFS's secured claim as did the debtor's initial plan. The amended plan also proposes to pay an additional $40,000 to unsecured creditors from a capital contribution to be made by the debtor's president and sole shareholder, Daniell Klein. It is this

new $40,000 contribution that distinguishes the amended plan from the initial plan. MLBFS filed its objection to the amended plan, and it once again cast its ballot against the debtor's plan.

**THE ABSOLUTE PRIORITY RULE**

Section 1129(a)(8) of the Bankruptcy Code provides that a court may not confirm a Chapter 11 plan unless each impaired class of claims or interests has accepted the plan. The plan provides that Class 3 consists of MLBFS's secured claim and Class 4 includes allowed unsecured claims, which includes MLBFS's unsecured claim. Both of those classes are impaired under the plan, and neither class accepted the plan.[1] The provisions of § 1129(a)(8) are therefore unsatisfied.

The Code, however, provides that, if the only requirement of § 1129(a) that has not been satisfied is paragraph (8), the court "shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). A plan is "fair and equitable" with respect to a class of unsecured claims only if it provides for the full payment of the claims with interest or "the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property." *Id.* § 1129(b)(2)(B). This is the "absolute priority rule," i.e., the rule that creditors have "absolute priority" over holders of equity interests.

---

[1] Class 3, the sole member of which is MLBFS, rejected the plan and, although a majority in number of the Class 4 claimants voted to accept the plan, those claimants do not hold two-thirds of the Class 4 claims in amount. *See* 11 U.S.C. § 1126(c).

Under this rule, unsecured creditors must be made whole or shareholders may not retain their ownership of the corporation. The plan in this case provides for unsecured creditors to receive $217,000 over a five-year period without interest while unsecured claims, including MLBFS's deficiency claim, total approximately $1.7 million. Because the plan provides for the debtor's shareholder to retain his equity interest, MLBFS argues that the absolute priority rule has been violated.

The debtor attempts to avoid the effects of the absolute priority rule by relying on a well-noted exception to that rule. Relying on *dictum* in *Case v. Los Angeles Lumber Products Co.*, 308 U.S. 106, 118 (1939), a number of courts, including the Sixth Circuit Court of Appeals, have held that the absolute priority rule is not a bar to confirmation if the shareholders "contribute new capital in money or money's worth, reasonably equivalent to the property's value, and necessary for successful reorganization of the restructured enterprise." *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 442 (1999) (assuming, without deciding, that *Los Angeles Lumber* survived enactment of 1978 Bankruptcy Code); *Teamsters Nat'l Freight Indus. Negotiating Comm. v. U.S. Truck Co. (In re U.S. Truck Co.)*, 800 F.2d 581, 588 (6th Cir. 1986) (applying *Los Angeles Lumber* in case under 1978 Code). When this "new value corollary" applies, the shareholder "is not receiving or retaining that interest 'on account of' his prior equitable ownership of the debtor. Rather, he is allowed to participate in the reorganized entity 'on account of' a new, substantial, necessary and fair infusion of capital." *203 N. LaSalle St. P'ship*, 526 U.S. at 442-43 (quoting Seventh Circuit opinion). The plan in this case provides for the debtor's shareholder to make a capital contribution in the amount of $40,000, which is to be distributed to unsecured creditors, and the debtor did produce some evidence that that amount

is "reasonably equivalent" to the stock's present value.[2] But the debtor did not carry its burden of showing that the capital contribution is necessary for a successful reorganization of the restructured enterprise.

For the corollary to apply, the new value must be "essential to the success of the undertaking." *Los Angeles Lumber*, 308 U.S. at 121; *U.S. Truck Co.*, 800 F.2d at 588. The debtor asserts that this requirement is satisfied because it "believes" that trade creditors would be more likely to sell to the debtor on credit terms if the capital contribution is made and that the ability to buy on credit terms would be beneficial to the debtor. The debtor, however, offered no proof to substantiate its belief. While a reorganized debtor may well receive more favorable credit terms from vendors than it received during the pendency of its bankruptcy case, the debtor presented no evidence that trade credit would be more likely if vendors share in a distribution of $217,000 (12.8%) rather than a distribution of $177,000 (10.4%). Hence, the evidence did not establish that a $40,000 capital contribution is essential or necessary to the debtor's successful reorganization.

Moreover, while courts have sometimes found that new value is "necessary or essential to the success of the reorganization" when "'the contribution is needed to enable the debtor to

---

[2] The debtor did not, however, present evidence regarding its future "reorganization value," which is shown by the capitalized value of future earnings. *See*, *e.g.*, *In re Crosscreek Apts., Ltd.*, 213 B.R. 521, 547-48 (Bankr. E.D. Tenn. 1997); *In re Beaver Office Prods., Inc.*, 185 B.R. 537, 543-44 (Bankr. N.D. Ohio 1995) (citing *Northwest Bank Worthington v. Ahlers*, 485 U.S. 197, 208 (1988)); *In re Creekside Landing, Ltd.*, 140 B.R. 713, 718 (Bankr. M.D. Tenn. 1992). The new capital contribution must be reasonably equivalent to the value of ownership and control, not merely the market value of the debtor's assets. *E.g.*, *In re Sunflower Racing, Inc.*, 226 B.R. 673, 691 (D. Kan. 1998) (citing *Ahlers*, 485 U.S. at 208); *Creekside Landing, Ltd.*, 140 B.R. at 718.

make payments due under the plan of reorganization and continue operating,'" *see Crosscreek Apts.*, 213 B.R. at 546 n.31 (citation omitted), the contribution of new capital must be "substantial." *Liberty Nat'l Enters. v. Ambanc la Mesa Ltd. P'ship (In re Ambanc la Mesa Ltd. P'ship)*, 115 F.3d 650, 654-44 (9th Cir. 1997); *In re Snyder*, 967 F.2d 1126, 1131 (7th Cir. 1992). As the Seventh Circuit has explained:

> The requirement that a contribution be substantial is independent of the rule that a contribution must be at least equal to the value of the interest retained. The substantiality requirement is derived not from *Los Angeles Lumber*'s third criterion, but from its first—that an infusion of new capital must be necessary to the success of the undertaking. Contributions that are merely nominal, or "gratuitous, token cash infusions proposed primarily to 'buy' cheap financing," will not suffice.

*Snyder*, 967 F.2d at 1131 (citations omitted). The $40,000 proposed to be contributed by the debtor's shareholder represent only 2.4% of the $1.7 million in unsecured claims. This small percentage fails the test for substantiality. *See*, *e.g.*, *In re Woodbrook Assocs.*, 19 F.3d 312, 320 (7th Cir. 1992) ($100,000 capital contribution equal to 3.8% of unsecured debt was not substantial); *Snyder*, 967 F.2d at 1131-32 (7th Cir. 1992) ($30,000 contribution representing 2.7% of unsecured debt and $50,000 contribution representing 4.5% of unsecured debt held insufficient); *In re Brotby*, 303 B.R. 177, 196 (B.A.P. 9th Cir. 2003) ($27,000 contribution representing 3.7% or 4.4% of unsecured claims was insufficient); *In re Sovereign Gp. 1985-27, Ltd.*, 142 B.R. 702, 710 (E.D. Pa. 1992) ($135,000 new value representing 3.6% of bank's deficiency claim held not substantial).

The court concludes that the new value corollary to the absolute priority rule has not been satisfied. Accordingly, the plan may not be confirmed because it does not satisfy the requirement set forth in § 1129(a)(8) of the Bankruptcy Code.

**VALUATION OF SECURED CLAIM**

The failure to satisfy the requirement in § 1129(a)(8) is not the only deficiency in the debtor's plan. The debtor has also undervalued the secured claim of MLBFS. When a secured creditor has rejected a plan, a debtor can attempt to obtain confirmation of (or "cramdown") a plan) over a secured creditor's objection by showing that the plan "does not discriminate unfairly, and is fair and equitable" with respect to the secured creditor. 11 U.S.C. § 1129(b)(1). The debtor contends that the plan is "fair and equitable" because it provides that MLBFS will retain its lien and receive "deferred cash payments totaling at least the allowed amount of such [secured] claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." *Id.* § 1129(b)(2)(A)(I). While MLBFS does not dispute the interest rate used in the plan to discount its distributions to present value, the parties differ widely on the value of the collateral and, therefore, the amount of the secured claim. *See id.* § 506(a) (claim is secured claim to extent of value of collateral and unsecured claim to extent it exceeds value of collateral).

The Supreme Court has held that 11 U.S.C. § 506(a) requires the valuation of collateral for cramdown purposes at "what the debtor would have to pay for comparable property (the 'replacement-value' standard)." *Assocs. Commercial Corp. v. Rash*, 520 U.S. 953, 955 (1997). The Court relied on § 506(a)'s mandate that "[s]uch value shall be determined in light of the pur-

pose of the valuation and of the proposed disposition or use of such property" and held that, if the debtor proposes to retain property, its value must be determined with reference to its value to the debtor. *Id.* at 961-62. The Court concluded that "the value of property retained because the debtor has exercised the § 1325(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed . . . use.'" *Id.* at 965. Although *Rash* arose in the context of a Chapter 13 case, there is no reason why its rationale should not apply in Chapter 11 cases. *In re Nguyen*, No. 05-53751, 2006 WL 2846822, at *1 (Bankr. W.D. La. March 21, 2006); *see also*, *e.g.*, *Winthrop Old Farm Nurseries, Inc. v. New Bedford Inst. for Sav. (In re Winthrop Old Farm Nurseries, Inc.)*, 50 F.3d 72 (1st Cir. 1995) (pre-*Rash* decision adopting going-concern standard in Chapter 11 cases); *In re Snider Farms, Inc.*, 79 B.R. 801, 811 (Bankr. N.D. Ind. 1987) ("Thus, the Court can perceive no reason why the method of valuing a debtor who is attempting to reorganize a going concern under Chapter 12 should be any different than valuing a debtor who is attempting to so reorganize in a Chapter 11, or Chapter 13."). Thus, in the words of one bankruptcy court, "[t]he essential inquiry is what 'value' does the collateral have to the estate." *Snider Farms, Inc.*, 79 B.R. at 811.[3]

MLBFS's appraiser testified that the tangible collateral in question has an aggregate "fair market value in place" of $902,770. The appraiser defines "fair market value in place" as the fair market value of the equipment "as installed for intended utilization" and defines "fair market value" as "the price that a willing buyer would be justified in paying and a willing seller would

---

[3] Accordingly, the debtor's "forced liquidation" value appraisal and MLBFS's "auction value" and "orderly liquidation value" appraisals are not relevant.

-8-

be warranted in accepting if each is: (1) well informed or well advised; (2) motivated by reactions of typical users; (3) free of undue stimulus; (4) financially capable of ownership and/or use; (5) allowed a reasonable time in which to test the market." The appraisal report indicates that the cost approach (replacement cost less depreciation) and the sales comparison approach (recent sales of comparable pieces of equipment) were used with heavier emphasis on the sales comparison approach. Next, MLBFS proposes to add $249,116 to its appraised value of the equipment to represent the total face amount of accounts receivable as of the commencement of the case.[4] It also proposes adding $149,543 to represent the total value of inventory as of the commencement of the case (according to the initial operating report). Accordingly, MLBFS asserts that the total value of its collateral is $1,301,429.

The debtor's appraiser testified that the equipment has an aggregate "fair market value" of $525,060 but that the debtor would have to pay an additional $75,000 to install the equipment if it had to replace the equipment, so that the total value of equipment collateral to the debtor is $600,060. The appraisal was based on "market research and previous experience." The debtor proposes to add to the equipment value the sum of $160,255, representing the total collectible amount of accounts receivable (the aggregate face amount of accounts that are no more than 60 days old), plus the sum of $73,131 representing the fair market value of inventory. Accordingly, the debtor's evidence shows that the total value of the collateral is $833,446.

---

[4] On July 7, 2005, and September 8, 2005, the court entered orders authorizing the debtor to use MLBFS's cash collateral "to the extent that it is replaced by post-petition cash and accounts receivable in an equal amount," and granted MLBFS a replacement lien on postpetition cash collateral.

The court need not decide which appraisal to accept or otherwise make a determination of the value of the collateral because, even accepting the debtor's evidence of value, the plan may not be confirmed over MLBFS's objection. The plan provides for MLBFS to receive $613,532.50 plus interest at the rate of 7.75% per annum in 20 quarterly installments of $37,101.99 each. However, the present value of the collateral according to the debtor's own evidence is approximately $220,000 more than the plan's valuation of the secured claim. The court concludes, therefore, that the plan does not provide for deferred cash payments having a present value at least equal to the secured claim and thus is not "fair and equitable" to Class 3. Accordingly, the plan may not be confirmed because it does not satisfy the requirement set forth in § 1129(a)(8) of the Bankruptcy Code.

**CONCLUSION**

For the foregoing reasons, the court will enter a separate order denying confirmation of the plan. Moreover, it is clear from the evidence that the debtor does not have equity in MLBFS's collateral, and the debtor has not carried its burden of showing that the collateral is "essential for an effective reorganization *that is in prospect*," i.e., that there is a "reasonable possibility of a successful reorganization within a reasonable time." *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 375-76 (1988); *see* 11 U.S.C. § 362(g)(2) (burden of proof is on "the party opposing such relief"). This case has been pending more than 16 months, the debtor lost the exclusive right to propose a plan more than a year ago, *see id.* § 1121(b), and neither of the plans proposed by the debtor may be confirmed. *See*, *e.g.*, *In re PMS Assocs. No. 2*, 104 B.R. 86, 89 (Bankr. S.D. Ind. 1989) (relief from stay granted when plan

filed in attempt to show that reorganization was in prospect violated absolute priority rule).

Accordingly, the court will also grant MLBFS's motion for relief from the automatic stay. 11 U.S.C. § 362(d)(2).

###